**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

VERNON LEE EVANS, JR.,
Petitioner-Appellant,

v.

WILLIE SMITH, Warden, United

States Penitentiary, Atlanta; J.
JOSEPH CURRAN, JR., Attorney
General of the State of Maryland,
Respondents-Appellees.

No. 99-22

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Benson E. Legg, District Judge.
(CA-97-3711-L)

Argued: May 3, 2000

Decided: July 17, 2000

Before WILKINSON, Chief Judge, and WILKINS
and WILLIAMS, Circuit Judges.

_____

Affirmed and dismissed by published opinion. Chief Judge Wilkinson
wrote the opinion, in which Judge Wilkins and Judge Williams
joined.

_____

**COUNSEL**

**ARGUED:** Gerald Ira Fisher, FISHER & HANSEN, P.C., Washing-
ton, D.C., for Appellant. Annabelle Louise Lisic, Assistant Attorney

General, Criminal Appeals Division, OFFICE OF THE ATTORNEY GENERAL, Baltimore, Maryland, for Appellees. **ON BRIEF:** A. Stephen Hut, Jr., Susan A. MacIntyre, Mark S. Morelli, WILMER, CUTLER & PICKERING, Washington, D.C., for Appellant. J. Joseph Curran, Jr., Attorney General of Maryland, Criminal Appeals Division, OFFICE OF THE ATTORNEY GENERAL, Baltimore, Maryland, for Appellees.

_____

**OPINION**

WILKINSON, Chief Judge:

Appellant Vernon Lee Evans was convicted and sentenced to death by Maryland juries for the contract murders of David Scott Piechowicz and Susan Kennedy. Evans now raises a number of claims in asking the federal courts to vacate his conviction and/or sentence. Finding no merit in these claims, we affirm the district court's denial of Evans' initial petition for habeas corpus. We also hold that Evans' claim under Brady v. Maryland, 373 U.S. 83 (1963), is a second or successive petition. As Evans has failed to meet the requirements for a second or successive petition under 28 U.S.C. § 2244(b)(2)(B), his Brady petition must also be dismissed.

I.

Vernon Lee Evans, Jr., was hired by Anthony Grandison to kill Cheryl and David Scott Piechowicz. The Piechowiczes were scheduled to testify as witnesses against Grandison in a federal narcotics case. Grandison agreed to pay Evans $9,000 for carrying out the murders.

The Piechowiczes worked at the Warren House Motel in Baltimore County, Maryland. On April 28, 1983, Susan Kennedy, the sister of Cheryl Piechowicz, was working in Cheryl's place along with Scott Piechowicz in the motel lobby. On that day, Evans, not knowing the Piechowiczes, entered the motel with the purpose of eliminating the couple on Grandison's behalf. After a short wait, Evans shot Scott Piechowicz and Susan Kennedy in the motel lobby. Evans fired nine-

2

teen bullets at the victims with a MAC-11 machine pistol equipped with a silencer or noise suppressor. The victims died from multiple gunshot wounds.

Evans was arrested and charged with federal and state crimes. In November 1983, he was convicted in federal district court, along with Grandison, Janet Moore, and Rodney Kelly, of witness tampering and interfering with the Piechowiczes' civil rights to be witnesses in a judicial proceeding. Evans was sentenced to life and ten years in prison, with the sentences to be served consecutively.

In 1984, Evans was tried on state charges in the Circuit Court for Worcester County, Maryland. Specifically, Evans was tried for two counts of first degree murder, conspiracy to commit murder, and the use of a handgun in the commission of a felony or crime of violence.

During the state trial, the prosecution offered overwhelming incriminating evidence against Evans through a number of witnesses. The most damaging testimony came from Charlene Sparrow, who was Evans' girlfriend at the time of the murders. Sparrow testified that she accompanied Evans and Janet Moore to the Baltimore City Jail two days before the shooting. At the jail, Evans and Moore met with Grandison, who was awaiting his federal drug trial. Sparrow then inspected the reception desk area of the Warren House Motel. She reported to Evans concerning the people working there and the presence or absence of security features. Sparrow also obtained a room at the motel with Evans' funds at his request. On the day of the murders, Evans told Sparrow to wait for him in the car behind the motel. Just before Evans walked to the motel, Sparrow looked inside the brown canvas bag he was carrying and saw a machine gun. Some ten to fifteen minutes later, Evans returned to the car, gave the smoking MAC-11 machine pistol to Sparrow, and asked her to wipe it down. Evans had also told her that he would receive $9,000 "if he knocked both of them off." Evans and Sparrow went to the mall that night to spend part of the proceeds from the murders.

Other witnesses also supplied incriminating testimony as to Evans' central role in the murders. For example, Moore testified as to her and Evans' visit to Grandison at the jail two days before the killings. Calvin Harper testified concerning the day of the murder and the two

3

days leading up to it. Harper's testimony included a description of Evans' acquisition of the machine pistol used in the crime from Rodney Kelly and Evans' statement that he liked the gun. Several other witnesses were able to place Evans in the motel lobby during the time immediately preceding the murders. For example, Etta Horne, who worked at the motel, identified Evans as the man she saw sitting in the motel lobby shortly before the murders. Helen Kondilidis, who had entered the motel shortly before the murders, also identified Evans as the man she saw sitting in the lobby.

The jury found Evans guilty of each of the crimes with which he was charged. The jury then sentenced Evans to death on each murder count. Evans was sentenced to life in prison for the conspiracy conviction and twenty years in prison for the handgun offense. These non-capital sentences were to run consecutively to each other, as well as consecutively to Evans' federal sentences of life and ten years.

The Maryland Court of Appeals affirmed Evans' state convictions and sentences on direct appeal. See Evans v. State, 499 A.2d 1261 (Md. 1985). In June 1986, the Supreme Court denied Evans' petition for certiorari. See Evans v. Maryland, 478 U.S. 1010 (1986).

Evans filed his first petition for state post-conviction relief in 1990 in the Circuit Court for Worcester County. The court denied relief on all claims except Evans' challenge to the constitutionality of the sentencing form used for the imposition of his death sentences. The court thus ordered that Evans be resentenced.

In November 1992, Evans was resentenced on his murder convictions. Evans' counsel focused primarily on mitigation evidence at the resentencing hearing. After the hearing, the jury returned two death sentences. These sentences were then affirmed by the Maryland Court of Appeals. See Evans v. State, 637 A.2d 117 (Md.), cert. denied, 513 U.S. 833 (1994).

In 1995, Evans filed a second petition for state post-conviction relief in the Circuit Court for Baltimore County. Evans raised a variety of claims relating both to his resentencing and to prior proceedings. The court denied relief on all claims. The Maryland Court of Appeals then denied Evans' application for review of this decision.

4

See Evans v. State, 693 A.2d 780 (Md.), cert. denied, 522 U.S. 966 (1997).

In November 1997, Evans filed a petition for habeas corpus in the United States District Court for the District of Maryland. Evans asserted numerous claims in his petition, including a claim that the prosecutor at Evans' guilt phase trial had exercised peremptory challenges in a racially discriminatory manner and claims of ineffective assistance on the part of resentencing counsel. The district court heard argument on the petition over two days in April 1998.

In April 1999, Evans filed a motion asking the district court to stay consideration of his petition so that he could exhaust a claim arising under Brady v. Maryland, 373 U.S. 83 (1963), in state court. Evans' Brady claim is based on his allegation that the state withheld an FBI report recounting an agent's witness interview with Janet Bannister. Evans contends that Bannister would testify that she saw an African American who was much taller than Evans with a duffel bag in the motel lobby and that she never saw Kondilidis in the lobby. Evans asserts that this testimony could have altered the outcome of his resentencing proceeding. The state counters, inter alia, that it did not withhold the report from Evans and that, in any event, nothing prevented Evans from raising this Brady claim long ago. Evans hoped to amend his habeas petition to assert this claim in federal court if the state courts denied relief.

In June 1999, the district court denied habeas relief. See Evans v. Smith, 54 F. Supp. 2d 503 (D. Md. 1999). The district court also denied the motion for a stay after receiving a proffer of Bannister's testimony. Evans then filed a motion under Fed. R. Civ. P. 59(e) to alter or amend the judgment, which the district court denied. The district court subsequently granted in part Evans' application for a certificate of appealability.

Later that year, Evans exhausted his Brady claim in the state courts. The Baltimore County Circuit Court denied without a hearing Evans' motion to reopen his post-conviction proceedings. See Evans v. State, No. 83-CR-2339 (Circuit Ct. for Baltimore County, Oct. 20, 1999). The court found that (1) Evans' allegations and affidavit were insufficient to raise the issue that the state had failed to provide excul-

5

patory material; (2) even if the state had failed to furnish the material, Evans had failed to show that he was prevented from acquiring the material and raising a Brady claim in his first attempt to seek state post-conviction relief; and (3) Bannister's statement was insufficient to support a reasonable probability that the disclosure of the statement would have altered the outcome of the resentencing proceeding. The Maryland Court of Appeals then denied Evans' application for leave to appeal. See Evans v. State, Misc. No. 18 (Md. Dec. 16, 1999).

On February 1, 2000, Evans filed a new habeas petition in the district court. This petition contained only Evans' Brady claim. He contemporaneously moved this court pursuant to 28 U.S.C. § 2244(b) for authorization to file a second or successive habeas petition consisting of the Brady claim. This court denied that motion on February 16, 2000. See In re Evans, No. 00-1 (4th Cir. Feb. 16, 2000) (order denying motion for authorization to file second or successive application for habeas relief). Evans has also asked the district court to treat his new habeas petition as a motion under Fed. R. Civ. P. 60(b) to reopen his original habeas petition in order to add the Brady claim.

II.

We evaluate Evans' habeas petition according to the standards prescribed by Congress at 28 U.S.C. § 2254 (1994 & Supp. III 1997), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214. We will thus grant habeas relief with respect to a claim adjudicated on the merits in state court proceedings only where such adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," id. § 2254(d)(2). A state court decision is contrary to clearly established federal law if the state court "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 120 S. Ct. 1495, 1523 (2000). A state court decision unreasonably applies clearly established federal law if the state court "identifies the correct govern-

6

ing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. We also accord state court factual findings a presumption of correctness that can be rebutted only by clear and convincing evidence. See 28 U.S.C. § 2254(e)(1).

III.

A.

The first claim raised by Evans on appeal is that the state exercised its peremptory challenges during jury selection for Evans' state trial in a racially discriminatory fashion in violation of Batson v. Kentucky, 476 U.S. 79 (1986). Batson provides that"the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." Id. at 89. A prosecutor is otherwise entitled to exercise his allotted peremptory challenges "for any reason at all, as long as that reason is related to his view concerning the outcome of the case." Id. (internal quotation marks omitted).

Batson sets forth a three-step evidentiary framework for evaluating claims of racial discrimination in jury selection. See id. at 93-98. This familiar framework is derived from the Supreme Court's equal protection and Title VII jurisprudence. See id. First, the defendant must make out a prima facie case that the prosecutor has exercised peremptory challenges in a racially discriminatory manner. See id. at 96-97. Second, if the defendant has made a prima facie showing, "the burden shifts to the State to come forward with a neutral explanation for challenging black jurors." Id. at 97. The prosecutor, of course, may not rebut the defendant's prima facie case "merely by denying that he had a discriminatory motive or affirming his good faith in making individual selections." Id. at 98 (internal quotation marks omitted). Rather, "the prosecutor must give a clear and reasonably specific explanation of his legitimate reasons for exercising the challenges." Id. at 98 n.20 (internal quotation marks omitted). Yet the explanation "need not rise to the level justifying exercise of a challenge for cause." Id. at 97. In fact, "[t]he second step of this process does not demand an explanation that is persuasive, or even plausible." Purkett v. Elem, 514 U.S.

7

765, 767-68 (1995) (per curiam) (internal quotation marks omitted). "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral," for in this context "a legitimate reason is not a reason that makes sense, but a reason that does not deny equal protection." Id. at 768, 769 (internal quotation marks omitted). Third, if the prosecutor has articulated "a neutral explanation related to the particular case to be tried," the trial court then has "the duty to determine if the defendant has established purposeful discrimination." Batson, 476 U.S. at 98. The defendant at all times bears the ultimate burden of persuasion as to the existence of purposeful discrimination. See, e.g., id. at 93; Purkett, 514 U.S. at 768.

In reviewing a trial court's decision concerning the presence of intentional discrimination, it is essential that we accord that decision the deference required by law. See, e.g., Hernandez v. New York, 500 U.S. 352, 364 (1991) (plurality opinion) ("[T]he trial court's decision on the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal."); Batson, 476 U.S. at 98 n.21 ("[A] finding of intentional discrimination is a finding of fact entitled to appropriate deference by a reviewing court." (internal quotation marks omitted)). As in other areas of the law that address invidious discrimination, "[w]hether the prosecutor intended to discriminate on the basis of race in challenging potential jurors is, as Batson recognized, a question of historical fact." Hernandez, 500 U.S. at 367. Indeed, deference to trial court findings on discriminatory intent is particularly important in this context because the Supreme Court has instructed that such findings turn principally on credibility determinations. See id. at 365; Batson , 476 U.S. at 98 n.21. As the plurality explained in Hernandez:

> In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge. As with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lies peculiarly within a trial judge's province.

8

500 U.S. at 365 (internal quotation marks omitted).

The precise formula used to review a finding of fact concerning prosecutorial motive in exercising peremptory challenges depends on the particular context. See id. Thus, on federal habeas, the same standard of review applied to other questions of fact governs our inquiry concerning intentional discrimination. See id. at 366. Accordingly, a state court's determination on this issue "shall be presumed to be correct" and the habeas petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

B.

Evans argues initially that no state court has actually applied Batson at any stage of this long course of litigation. As a result, Evans claims, the state court decisions are entitled to no deference under the habeas statute. Evans contends that these decisions are instead "contrary to . . . clearly established Federal law", 28 U.S.C. § 2254(d)(1), and that he is therefore entitled to a new trial. Evans further argues that the prosecutor's exercise of his peremptory challenges did not in any event comport with Batson's requirements.

Our review of the record, however, has uncovered no reason to overturn Evans' conviction on Batson grounds. To begin with, the trial court demonstrated that it was very sensitive to the possible use of race-based peremptory strikes during the jury selection process. Although jury selection in Evans' state trial took place two years before Batson was decided, the trial court warned the prosecutor that "[t]here has been some extremely strong language in dicta about using peremptory challenges for racial purposes." The court then instructed the prosecutor to take this case law into account in exercising the state's peremptory challenges. The court also kept a record of the racial identities of the potential jurors that were struck and the jurors that were seated.

After the jury had been selected, Evans' counsel informed the court that the panel was unacceptable to the defendant because the defense believed that the state had "exercised its peremptory challenges to purposely limit blacks from representation on the panel." The state

9

had utilized eight of its ten peremptory challenges to strike African Americans from the venire. Two of the twelve jurors chosen were African Americans, and one of the two alternates later chosen was also African-American.

The court invited the prosecutor to respond to Evans' objections. The prosecutor explained, "We struck on background, age, occupation, what was learned during the voir dire at the bench and in open court. We did not strike on racial grounds." After some further discussion, the court overruled Evans' objections and stated that the objections were noted for the record. Evans did not ask the court to seek any further explanation of the peremptory strikes from the prosecutor.

It is thus clear that the trial court applied Batson in essence. The trial court warned the prosecutor that it would scrutinize the state's exercise of its peremptory challenges for any racial bias. When the defense objected, the court gave the prosecutor an opportunity to explain his actions. The prosecutor provided a race-neutral explanation that the trial court could assess in light of its own observation of jury selection. Evans provided no further support for his allegation of intentional discrimination and did not seek further explanation from the prosecutor. Although the trial court did not record explicit findings, its overruling of Evans' objection in the context of the proceedings makes it clear that the trial court accepted the prosecutor's explanation and found that there was no discriminatory intent.

Evans nonetheless contends that the trial court erred in failing to require the prosecutor to render individualized explanations for each particular peremptory strike of an African American. Batson, however, does not require individualized explanations for peremptory strikes. Rather, it requires only that the explanation be race-neutral, see Batson, 476 U.S. at 97, "clear and reasonably specific," id. at 98 n.20, and "related to the particular case to be tried," id. at 98. While the prosecutor in many cases will offer more individualized explanations, a court may nonetheless find that the prosecutor has complied with Batson based on an overall explanation that is found satisfactory as to each of the challenged strikes, see, e.g. , United States v. Allison, 908 F.2d 1531, 1537, 1538 n.9 (11th Cir. 1990); United States v. Davis, 871 F.2d 71, 72 (8th Cir. 1989). Here it is apparent that the trial court found that the prosecutor's explanation was satisfactory as

10

to each individual juror. And like the Supreme Court, we refuse to impose stringent, detailed requirements as to how trial courts are to implement Batson. See Batson, 476 U.S. at 99 & 99-100 n.24. We therefore cannot say that the trial court acted contrary to the law of Batson.

Not only did the state trial court apply Batson in essence, but no state court to which Evans' Batson claim was subsequently presented indicated that it found any merit in the claim. In 1985, the Maryland Court of Appeals applied a remarkably Batson-like framework itself in affirming the trial court's judgment on direct appeal. The appellate court noted that, whereas the Supreme Court's decision in Swain v. Alabama, 380 U.S. 202 (1965), required defendants to prove systematic exclusion of racial minorities from juries over time, there was a growing body of state and federal case law that enabled a defendant to show a constitutional violation based on the exercise of peremptory challenges at the defendant's trial alone. See Evans, 499 A.2d at 1281; see also Ford v. Georgia, 498 U.S. 411, 420 (1991) ("Batson did not change the nature of the violation recognized in Swain, but merely the quantum of proof necessary to substantiate a particular claim"). Indeed, several of the cases relied upon by the Maryland Court of Appeals for its evidentiary framework were also cited by the Supreme Court in Batson both in describing the growing departures from Swain's burden and in articulating the Batson framework itself. Compare Batson, 476 U.S. at 82 n.1, 92 n.17, 97, 98 n.20, with Evans, 499 A.2d at 1281.[1] The Maryland court also pointed to a number of other state cases employing a Batson-like framework and noted that in commenting on the denial of certiorari in McCray v. New York, 461 U.S. 961 (1983), five Justices indicated that the time might be approaching for a reexamination of Swain. See Evans , 499 A.2d at 1281.

_____

[1] The Supreme Court also noted with approval in Batson that some states had been "applying a version of the evidentiary standard we recognize today." Batson, 476 U.S. at 99. Further, the Court "decline[d] . . . to formulate particular procedures to be followed upon a defendant's timely objection to a prosecutor's challenges." Id.; see also id. at 99-100 n.24 ("In light of the variety of jury selection practices followed in our state and federal trial courts, we make no attempt to instruct these courts how best to implement our holding today.").

11

The appellate court then described the strikingly <u>Batson</u>-like approach proposed by recent cases:

> Each [case] starts with the presumption established by <u>Swain</u>, that the prosecution is using the State's challenges properly. Each then requires the defendant to establish a prima facie case of discrimination sufficient to overcome the presumption, followed by an opportunity for explanation on the part of the prosecution if a prima facie case is made out, with the ultimate resolution of any dispute to be made by the trial judge.

<u>Evans</u>, 499 A.2d at 1281. The court then applied this framework to Evans' claim. It began by assuming <u>arguendo</u> that Evans had made a prima facie showing of discrimination and proceeded to assess the prosecutor's explanation.**2** <u>See id.</u> at 1282. The court concluded, however, that "the explanation offered by the prosecutor, and apparently accepted by the court, was sufficient under the circumstances to support the decision of the trial judge in overruling the defendant's objection." <u>Id.</u> The court emphasized that "the explanation of the prosecutor stood uncontroverted and unimpeached." <u>Id.</u>

Further, the first state post-conviction court found in 1991 -- five years after <u>Batson</u> had been decided -- that the earlier state court conclusions were consistent with the subsequent Supreme Court decision. Although the first state post-conviction court found that Evans' <u>Batson</u> claim had been "finally litigated," it nonetheless examined Evans' claim in light of <u>Batson</u> to find that no constitutional violation had occurred. And the second state post-conviction court declined to address the substance of Evans' <u>Batson</u> claim because it found that the matter had already been "finally litigated." Thus, the state courts

_____

**2** Indeed, this assumption was appropriate, for "[o]nce a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." <u>Hernandez</u>, 500 U.S. at 359 (plurality opinion); <u>see also United States Postal Serv. Bd. of Governors v. Aikens</u>, 460 U.S. 711, 715 (1983).

12

that had the opportunity to reevaluate Evans' claim in light of the <u>Batson</u> decision found no reason to disturb the earlier adjudications.

Evans nonetheless argues that a <u>Batson</u> violation did in fact occur. For example, he attacks the prosecutor's explanation at this late stage by asserting that some similarly situated jurors were not stricken from the venire. Evans claims that the prosecutor's proffered reasons thus cannot explain the prosecutor's exercise of his peremptory challenges.

But as the Supreme Court has stated, our review of a trial court's adjudication of a <u>Batson</u> claim must be marked by great deference to the trial court's finding on the question of discrimination. <u>See, e.g.,</u> <u>Batson</u>, 476 U.S. at 98 n.21; <u>Hernandez</u>, 500 U.S. at 364 (plurality opinion); <u>see also Matthews v. Evatt</u>, 105 F.3d 907, 917 (4th Cir. 1997) (trial court's <u>Batson</u> findings "turn largely on credibility determinations" and are thus entitled to deference); <u>United States v. Bynum</u>, 3 F.3d 769, 772 (4th Cir. 1993) (trial court is in best position to enforce <u>Batson</u>'s requirements because trial court can evaluate the prosecutor's candor in offering reasons for challenges). Indeed, it would be an impermissible exercise in hindsight for us now to upset the trial court's credibility determination in evaluating the prosecutor's explanation. And as the district court correctly observed, the "retrospective parsing of the `curricula vitae' of the jurors" is no substitute for the observations of the trial judge, who witnessed firsthand the process. We simply cannot overlook the fact that the trial court had conducted an extensive voir dire of the jury pool, which was documented in several hundred pages of trial transcripts, and was able to observe the demeanor and hear the responses of the prospective jurors in court. This insight enabled the trial court to compare the prosecutor's explanation with what occurred at the bench and in open court. Most significantly, the trial court was able to observe the prosecutor's demeanor and conduct and evaluate the credibility of his explanation. And all of this was after the court had warned the prosecutor that his peremptory challenges would be under scrutiny for any taint of racial bias. Evans has failed to persuade us that the trial court's finding that there was no intentional discrimination was incorrect.

In sum, the state courts have carefully examined on several occasions Evans' challenge to the prosecution's exercise of its peremptory

13

strikes. They have examined the prosecution's conduct for any hint of racial animus, and none of these courts has found that a constitutional violation occurred. And Evans has failed to overcome the presumption of correctness accorded to the state courts' conclusion that there was no racial discrimination in the selection of his jury. We hold that the state court adjudications were neither "contrary to" nor "an unreasonable application of" clearly established federal law. 28 U.S.C. § 2254(d)(1). The district court therefore properly denied Evans' request for habeas relief on his Batson claim.

IV.

Evans next claims that he was denied his Sixth Amendment right to the effective assistance of counsel at his resentencing. Such claims are governed by the standards prescribed by the Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984), and its progeny, see, e.g., Nix v. Whiteside, 475 U.S. 157 (1986); Kimmelman v. Morrison, 477 U.S. 365 (1986); Lockhart v. Fretwell, 506 U.S. 364 (1993); Williams v. Taylor, 120 S. Ct. 1495 (2000). In order to make out an ineffective assistance claim, a convicted defendant must show both that counsel's performance was deficient and that this deficient performance prejudiced the defendant. See Strickland, 466 U.S. at 687. The performance prong requires the court to determine whether counsel's conduct, viewed from counsel's perspective at the time and in light of all the circumstances, fell "outside the wide range of professionally competent assistance." Id. at 688-89, 690. In other words, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." Id. at 688. Judicial scrutiny of counsel's performance, of course, "must be highly deferential" and must scrupulously seek to "eliminate the distorting effects of hindsight." Id. at 689. The prejudice prong requires the court to ask whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id.

A.

Evans first claims that resentencing counsel were deficient in failing to interview several witnesses whose testimony would purportedly

14

have helped to show that Evans was not a "principal in the first degree" and thus not death-eligible under Maryland law. See Md. Code Ann. art. 27, § 413(e)(1) (Supp. 1999); Gary v. State, 671 A.2d 495, 498 (Md. 1996). Specifically, Evans claims that counsel acted incompetently in failing to interview Roberta Weinstein, who saw part of the shootings, and Darece Pinkney, whose testimony allegedly corroborated some of Weinstein's observations, even though counsel had access to the names, roles, and whereabouts of these individuals. Evans contends that the testimony of these witnesses would have provided evidence that he was not the shooter and therefore not a principal in the first degree. Evans claims that there is a reasonable probability that, but for counsel's error, the result of the resentencing proceeding would have been different.

We disagree. The performance of Evans' counsel with respect to the principalship issue was not constitutionally deficient but rather was the product of reasonable tactical decisions. And even if counsel's performance were deficient, any error failed to prejudice Evans within the meaning of Strickland.

Both Weinstein and Pinkney testified at Evans' second state post-conviction proceeding in 1996. Weinstein testified that, while working in her jewelry store in the Warren House, she heard a sound "like glass crashing" and ran to the store window. She then saw the back and side of the gunman through the window from a distance of approximately thirty feet. She stated that she "really could not see" the gunman's face and could not discern his race. Weinstein estimated the gunman's height as 5'7" or 5'8", whereas Evans is 5'2". Weinstein could not identify Evans as the shooter at a line-up shortly after the incident, and upon viewing Evans in the courtroom, she stated that the shooter was "a lot taller." She further stated that there may have been another person in the lobby at the time, but she was not sure and could not give any details about this possible individual.

Pinkney testified that shortly after the shooting, while standing on her front porch about two doors down from the Warren House Motel, she "saw a man just streak past [her] door" from the direction of the motel. Pinkney stated that the individual was black and estimated the person's height to be about 5'8" or 5'9". Upon viewing Evans in the courtroom as he stood at counsel's table, she claimed that the individ-

15

ual she saw fleeing was "much taller." Weinstein and Pinkney each testified as well that the individual they saw was wearing a light-colored top and dark pants, whereas Sparrow stated that Evans had worn a suit to the motel that day. Both Weinstein and Pinkney gave statements prior to Evans' guilt/innocence trial, and both seemed to be willing to testify at Evans' resentencing had they been called.

Evans' resentencing counsel, Sally Chester and William Kanwisher, each testified at the second state post-conviction proceeding as to their preparation for and conduct at resentencing. Evans cites their testimony in an effort to show that their failure to call Weinstein and Pinkney was a product of mere neglect rather than tactics. Chester testified that she and Kanwisher had decided that they "could not win on the principality issue." Counsel instead concluded that "if we were going to get [Evans] a life sentence, [it] was going to happen in mitigation." As Kanwisher testified, "we felt that the emphasis ought to be on what we thought was pretty good positive mitigation in the case." Chester further stated that "Mr. Kanwisher and I came to the conclusion that mitigation was really the only way that we had to go of any substance" and that "it doesn't take a Rhodes Scholar to figure out that we were not in a very good position as to first degree principal in this case."

As a result, at resentencing, Chester did not emphasize principalship in her opening statement. Rather, she emphasized mitigation and then presented a number of mitigation witnesses, including relatives of Evans and individuals who could attest to his behavior in prison. Evans himself professed to be a remorseful and changed man during his allocution to the jury. Chester testified that she was "prepared to argue first degree principal" if the government's case "had fallen through," but she stuck to her plan of "presenting a lot of evidence in mitigation" because "[w]e felt that was the strongest part of our case and that is what we had to go with." After the government had put on an overwhelming demonstration that Evans was the triggerman -- thus presenting a case that Chester acknowledged had not "fallen through" -- she conceded principalship in her closing argument and pressed for mitigation.

When questioned about Weinstein and Pinkney, Chester testified that, at the time of resentencing, she did not have any evidence that

16

she believed would work to show that Evans was not the shooter. Chester recalled that Weinstein, who had testified at Evans' federal trial, "was unable to identify [the shooter] one way or the other." Chester also stated, however, that had she known that Weinstein was willing to say that the shooter was substantially taller than Evans, she would have presented that evidence. When asked if she had any tactical reason for not presenting such evidence, Chester responded that she did not. Chester acknowledged, however, that trying to contest principalship while at the same time arguing mitigation would have been "difficult" and "not desirable," albeit "not impossible and not inconsistent." Kanwisher likewise stated that, had he possessed evidence that an individual claimed that the shooter was much taller than Evans, he would have presented that evidence at resentencing. Kanwisher claimed that he "lost track" of Weinstein and that Pinkney "fell through the cracks."

The second state post-conviction court rejected Evans' ineffective assistance claim. The court found that counsel's conduct flowed from a reasonable decision to pursue primarily a mitigation strategy at resentencing rather than contesting principalship. The court found that counsel "chose a trial strategy not to challenge the State's evidence on [the principalship] issue," "chose to present a position of remorse and rehabilitation," and "pursued the strategy competently and consistently." The court concluded that "the decision to pursue mitigation was a sound tactical one reached after considering the issue and consulting with [Evans] and [Evans] voicing no objection."

We cannot say that the state court's adjudication was contrary to or unreasonably applied federal law. The Supreme Court has stated that "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Strickland, 466 U.S. at 690-91. "In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Id. at 691. Accordingly, "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Id.

As the district court noted, Evans' counsel ceased their efforts to locate Weinstein and Pinkney only after concluding that principalship

17

was likely a lost cause and that the best strategy was to focus on mitigation. The decision to emphasize what counsel believed was strong mitigation evidence was certainly reasonable and made further investigations into principalship unnecessary. Moreover, the decision not to contest principalship was eminently reasonable in light of the state's strong evidence that Evans was the shooter. The state had presented this evidence at Evans' guilt/innocence trial, and trial counsel's efforts to challenge these witnesses and argue that Evans was not the triggerman were utterly unsuccessful. Not only did the jury return a verdict of guilty, but the jury also necessarily found that Evans was a principal in the first degree in imposing two death sentences. Indeed, as the district court noted, any attempt to reprise the failed principalship strategy might itself have been of questionable judgment. A focus on principalship may actually have undermined the defense by calling even greater attention to the details of the crime in which Evans was undisputably involved.

Further, resentencing counsel acknowledged that they had no plausible alternative theory to offer as to who was the shooter. While they had considered the possibility of trying to plant the thought that Rodney Kelly may have been the shooter, they abandoned this tack because they simply "couldn't find a way to do it." Indeed, according to a police detective, Kelly stood at 6'3" and was thus a poor match for the allegedly 5'7" to 5'9" individual glimpsed by Weinstein and Pinkney. Finally, though principalship and mitigation are not inconsistent in theory, counsel was correct to observe the practical difficulties of highlighting contrition while denying a species of wrongdoing. In light of all of this, the failure to interview Weinstein and Pinkney was not incompetent. Evans has thus failed to "overcome the presumption that, under the circumstances, [counsel's] action might be considered sound trial strategy." Id. at 689 (internal quotation marks omitted).

Even if counsel's performance were constitutionally deficient, Evans was not prejudiced by any error. As noted, the state's evidence against Evans on the question of principalship was simply overwhelming. The state presented testimony that Grandison had hired Evans to kill the Piechowiczes and that Evans stated he would receive $9,000 "if he knocked both of them off." A number of witnesses placed Evans in the lobby near the time of the shootings. Sparrow tes-

18

tified that Evans carried a canvas bag with a gun in it to the motel shortly before the murders and was carrying the smoking machine pistol shortly after the murders. Chester herself acknowledged that Sparrow's testimony "pretty much put the nails in our coffin because I couldn't seem to impeach her." In addition, Harper testified as to Evans' acquisition of the gun from Kelly and Evans' statement that he liked the gun.

Against this mountain of evidence, there is little possibility that the testimony of Weinstein and Pinkney would have made a difference. Weinstein estimated the gunman's height from a distance of thirty to thirty-five feet and was unable to see his face or discern his race. Further, the district court noted that Weinstein had overestimated the height of Scott Piechowicz by three to four inches, and her estimate of the gunman's height as 5'7" or 5'8" was based partly on her belief that Scott was "a head taller" than the gunman. As for Pinkney, she did not see the shooting but merely described an individual who had suddenly "streaked" past her front porch. Finally, even if counsel had presented this rather weak evidence, it likely would still have been in the context of what was primarily a mitigation strategy. Indeed, as we have already noted, pursuit of the principalship strategy may even have been detrimental to Evans' efforts to avoid a capital sentence.

B.

Evans also claims that resentencing counsel were deficient in failing to conduct further investigation and offer expert testimony concerning Evans' likely federal parole date. Evans claims that there is a reasonable probability that, but for these errors, the result of the resentencing proceeding would have been different.

We disagree. Evans has failed to show either that counsel's performance with respect to the parole issue was deficient or that he was prejudiced by any possible error. Under Maryland law, a capital defendant may present information to the sentencing jury concerning his eligibility for parole in the event a life sentence is imposed. See Doering v. State, 545 A.2d 1281, 1295 (Md. 1988). Accordingly, Evans' resentencing counsel telephoned the federal penitentiary in Marion, Illinois, where Evans was serving his federal sentences of life plus ten years, and inquired as to Evans' parole eligibility. Chester

19

and Kanwisher testified at the second state post-conviction proceeding that the information they received from the penitentiary was that Evans could or would be paroled in 1993 or 1996. At that point, Evans would begin serving his state sentences. Because of the proximity of what Evans' counsel believed to be his parole date, they avoided the issue of federal parole at resentencing"like the plague."

Counsel instead concentrated on convincing the jury that the imposition of life sentences would ensure that Evans would likely die in prison or at least not receive parole until he was very old (Evans was forty-three years old at the time). Most significantly, counsel called Paul Davis, the Chairman of the Maryland Parole Commission, to testify on Evans' behalf. The essence of Davis' testimony was that Evans would not be eligible for state parole until at least several decades into his state sentences and that someone in Evans' position was unlikely to be paroled even after becoming eligible.

Further, counsel argued forcefully at both opening and closing that Evans was not going anywhere. In her opening statement, Chester stated that "two life sentences in this case will undoubtedly mean that this man will never walk outside the walls of a prison again." Chester also explained to the jury that Evans was already serving the first of four consecutive sentences: "Vernon Evans is serving a sentence right now that nobody is going to touch, that isn't going to go away of life plus ten years, another sentence of twenty years added on to that. So, we're up to life plus thirty, and another life sentence on that. In this case he can receive or will receive two more life sentences or the death penalty." At closing, counsel recapitulated Davis' testimony, did the math for the jury, and concluded that Evans would not be eligible for parole until he was at least eighty, "which is highly unlikely under the circumstances of the prison world . . . and even then, as you heard Mr. Davis say, lifers don't get paroled that easily. They simply don't." The prosecutor noted in response that an inmate is eligible for parole after serving fifteen years of a life sentence and that there was no proof that Evans would die in jail. Yet the prosecutor spent most of his closing argument focusing on the "murder for hire" nature of the killings and Evans' unrepentant, unrehabilitated condition.

Evans contends that if counsel had conducted further research, they would have learned that Evans was highly unlikely to be paroled in

20

1993 or 1996 and would likely serve at least thirty years in federal custody. Evans claims that counsel acted incompetently for doing no more than contacting a representative of the Marion penitentiary and should instead have consulted experts on federal parole who could provide information that Evans was unlikely to receive federal parole for another thirty years. According to Evans, there is a reasonable probability that the jury would not have sentenced him to death if it had received such information.

The second state post-conviction court rejected Evans' claim on the merits, finding that "[t]he jury had before it sufficient testimony and argument that Petitioner was unlikely to ever be released from prison." We find no reason to disturb this conclusion. Evans' counsel acted reasonably in contacting the federal penitentiary where Evans was incarcerated at the time in an effort to determine when he was eligible and likely to be released from federal custody. It was not unreasonable for counsel to rely on that information without consulting an outside expert in federal parole. Indeed, counsel acknowledged that "we felt that that information that we received was good information." It was also reasonable for counsel then to avoid the issue of federal parole and concentrate instead on the evidence that Evans' numerous, lengthy, and consecutive sentences would likely keep him behind bars for the rest of his life. Indeed, Evans' counsel even called the state parole commission chairman to the stand to hammer this point home. We thus cannot say that counsel's performance with respect to this matter was incompetent.

Nor did Evans suffer any prejudice from counsel's course of action even if such course were deficient. Evans makes much of the fact that shortly before returning the death sentences, the resentencing jury sent the court a note with questions concerning how many years Evans might serve in prison, and the court simply referred the jury to the evidence that it already possessed. But as Evans' counsel argued at closing and the state post-conviction court observed, the evidence before the jury was more than sufficient to show that Evans would likely spend the rest of his life in prison. Even were we to indulge Evans' speculation concerning the significance of the jury's question, there is no reason to believe that the piece of information or expert testimony that Evans wishes had been presented would have altered the outcome of the proceeding.

21

We thus cannot say with respect to either ineffective assistance claim that "counsel's conduct so undermined the proper functioning of the adversarial process that the [proceeding] cannot be relied on as having produced a just result." Strickland , 466 U.S. at 686. Accordingly, the state court adjudications of these claims were neither contrary to clearly established federal law nor an unreasonable application of that law.

V.

The final set of issues relates to Evans' attempt to raise his Brady claim with regard to Janet Bannister's testimony in the district court after having filed his initial federal habeas petition.**3** We evaluate his arguments under the federal habeas statute as amended by AEDPA and in light of the significant interests in finality, prompt adjudication, and federalism that underlie the federal habeas scheme.

A.

Evans argues that the district court should have stayed the federal proceedings so that he could exhaust his Brady claim in state court and then add this claim to his pending habeas petition if the state courts denied relief. We review the district court's decision whether to stay the proceedings pending exhaustion for abuse of discretion. See, e.g., Brewer v. Johnson, 139 F.3d 491, 492 (5th Cir. 1998); Calderon v. United States Dist. Ct. for the Northern Dist. of California, 134 F.3d 981, 987-88 (9th Cir. 1998); see also Hill v. Mitchell, 30 F. Supp. 2d 997, 1000-01 (S.D. Ohio 1998).

We find that the district court acted within its discretion in denying Evans' request for a stay. The district court properly concluded that none of Evans' reasons for requesting a stay justified a delay in the proceedings.

_____

**3** On February 16, 2000 this Court issued an order denying Evans' motion for authorization to file a second or successive application for habeas relief. Evans, however, continues to press his Brady claim. We construe his position as a Motion to Reconsider our earlier order and take this opportunity to explain it more fully.

22

First, there was no threat of imminent execution. Indeed, the state had agreed not to seek an execution warrant during the litigation of either the federal habeas petition or the Brady claim in state court. The district court further noted that a stay of execution could be issued in the event that the state sought to execute Evans before he had fully litigated his Brady claim.

Second, a stay was not required to preserve an opportunity for federal review. The district court correctly noted that if the state courts ruled against Evans on his Brady claim, Evans would be able to ask the Fourth Circuit for permission to file a second or successive petition. In fact, as discussed below, Evans later filed a motion in this court pursuant to 28 U.S.C. § 2244 for authorization to file a second or successive application for relief, which this court denied. See In re Evans, No. 00-1 (4th Cir. Feb. 16, 2000) (order denying motion for authorization to file second or successive application for habeas relief). As the district court observed, the grant of a stay and subsequent leave to amend would have circumvented the habeas statute. Such action would have allowed Evans to file what would essentially be a second or successive petition while evading the prerequisites that Congress has established for the filing of such petitions.

Third, the district court found that the powerful interests in finality and prompt adjudication that govern habeas proceedings outweighed any possible harm from the piecemeal litigation that might result from the denial of a stay. The district court was justifiably sensitive to the interests of the parties, as well as of the state and federal judicial systems, in settling the merits of the claims in Evans' properly filed habeas petition as soon as possible.

We thus find that the district court did not abuse its discretion in declining to grant a stay.**4**

_____

**4** The district court also properly declined to grant a stay pending the Supreme Court's decision in Williams v. Taylor , 120 S. Ct. 1495 (2000). We have considered the district court's denial of Evans' habeas petition in light of Williams and the other applicable law, and we find no error.

B.

Evans also now contends that the Supreme Court's recent decisions in <u>Stewart v. Martinez-Villareal</u>, 523 U.S. 637 (1998), and <u>Slack v. McDaniel</u>, 120 S. Ct. 1595 (2000), permit him to raise his <u>Brady</u> claim in a new habeas petition without being subject to the standards governing the filing of second or successive petitions prescribed in 28 U.S.C. § 2244(b).**5** In Evans' view, he is not required to meet the prerequisites for a second or successive petition in order to bring his <u>Brady</u> claim because he allegedly could not discover the <u>Brady</u> claim until after the instant habeas petition had already been filed.

_____

**5** Section 2244(b) provides:

> (1) A claim presented in a second or successive habeas corpus application under section 2254 that was presented in a prior application shall be dismissed.

> (2) A claim presented in a second or successive habeas corpus application under section 2254 that was not presented in a prior application shall be dismissed unless --

> (A) the applicant shows that the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

> (B)(i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and

> (ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

On February 2, 2000, Evans moved this court pursuant to this subsection for authorization to file a successive petition. Evans specifically invoked § 2244(b)(2)(B) as the basis for permitting him to bring his <u>Brady</u> claim, which had not previously been presented in a habeas petition, in a new petition. After carefully reviewing the parties' submissions, this court denied authorization to file a successive application for relief because Evans had failed to make a prima facie showing that his application met the cause and prejudice standards of § 2244(b)(2)(B). <u>See</u> Order of February 16, 2000; 28 U.S.C. § 2244(b)(3)(C).

24

We disagree. To begin with, the standards that Congress has established for the filing of second or successive petitions account for precisely the type of situation Evans alleges. Congress has empowered the courts of appeals to authorize the filing of a second or successive habeas petition where "the application makes a prima facie showing that the application satisfies the requirements of[§ 2244(b)]." 28 U.S.C. § 2244(b)(3)(C). Accordingly, a petitioner may be able to present a claim for the first time in a successive habeas petition where the claim relies on a new rule of constitutional law, see 28 U.S.C. § 2244(b)(2)(A), or, if the claim is based on newly discovered evidence, where the petitioner can make a prima facie showing of both cause and prejudice within the meaning of § 2244(b)(2)(B)(i) and § 2244(b)(2)(B)(ii). These requirements serve the important interests in finality and respect for state court judgments that underlie the statutory habeas scheme. Cf. Williams v. Taylor, 120 S. Ct. 1479, 1490 (2000); McClesky v. Zant, 499 U.S. 467, 493 (1991). At the same time, the statute affords an opportunity to bring new claims where the petitioner can show that he was not at fault for failing to raise those claims previously and where the claim, if meritorious, would sufficiently undermine confidence in the judgment at issue.

Evans failed to make a showing of cause and prejudice in his February 2, 2000 request to file a second or successive petition under § 2244(b). In light of the ample evidence in the record supporting the judgments of both the guilt phase jury and the resentencing jury, Evans simply cannot "establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found [him] guilty of the underlying offense." 28 U.S.C. § 2244(b)(2)(B)(ii). Even if a Brady violation had occurred, Evans' proffer of Bannister's testimony shows that such evidence would hardly undermine confidence in the juries' conclusions. Bannister would essentially testify that shortly before the murders she saw a neatly dressed African-American man in the lobby who at one point stood next to her and whom she would estimate to be around 5'7" or 5'8". Bannister would also claim that there was a tan duffel bag near where the man had been seated and that she and Helen Kondilidis were not in the lobby at the same time. These inconclusive observations amount to little in light of the copious testimony that proves, inter alia, that Evans contracted with Grandison to murder the Piechowiczes; that Evans carried a gun of the same type used in the mur-

25

ders into the motel shortly before the shootings; that Evans was in the motel lobby shortly before the killings occurred; and that Evans was seen literally carrying a smoking gun very shortly after Kennedy and Piechowicz were gunned down.

And all this is to say nothing of the state's arguments and the state post-conviction court's conclusion that Evans lacked cause for failing to discover and bring his Brady claim previously. Indeed, we have taken some pains in this opinion to explain why we believe that the case against Evans is an overwhelming one as to both guilt and principalship. Accordingly, we have denied authorization to file a successive petition because Evans has failed to meet the statutory standard. See In re Evans, No. 00-1 (4th Cir. Feb. 16, 2000) (order denying motion for authorization to file second or successive application for habeas relief). Evans cannot now have yet another bite at the apple. His attempt to undermine the state courts' conclusions with the most marginal of testimony packaged in Strickland and Brady claims is simply grasping at straws.

To exempt Evans' Brady claim from the requirements of § 2244(b) would thwart the statutory scheme and render Congress' limitations on second or successive petitions a nullity in a wide range of cases. Indeed, it would open the federal courts to all sorts of allegedly newly discovered claims without requiring petitioners to show both cause and prejudice for failing to bring these claims in their previously adjudicated petitions. AEDPA's purpose of achieving timely, final resolutions of claims in the interests of justice and out of respect for state judicial processes would surely be eroded under such a regime.

Further, we are not persuaded that the Supreme Court's recent decisions in Slack and Martinez-Villareal entitle Evans to escape the statutory restrictions on "second or successive" petitions in seeking federal habeas review of his Brady claim. Those cases address the question of what constitutes a "second or successive" petition for purposes of the habeas statute. Both cases, however, are concerned with situations entirely different from that in the instant case.

In Martinez-Villareal, the prisoner filed a habeas petition raising a number of claims, including an Eighth Amendment claim under Ford v. Wainwright, 477 U.S. 399, 410 (1986), that he was incompetent to

26

be executed. The district court dismissed Martinez-Villareal's <u>Ford</u> claim as premature but adjudicated other claims on the merits. When Martinez-Villareal's <u>Ford</u> claim later ripened because the state had obtained an execution warrant, he moved the district court to reopen the <u>Ford</u> claim. The district court stated, however, that it did not have jurisdiction over the claim because Martinez-Villareal was bringing the claim in a "second" petition.

The Supreme Court disagreed and held that the <u>Ford</u> claim was not a "second or successive" petition under § 2244(b). <u>See Martinez-Villareal</u>, 523 U.S. at 645. The Court stated that "[t]here was only one application for habeas relief, and the District Court ruled (or should have ruled) on each claim at the time it became ripe." <u>Id.</u> at 643. The Court also analogized the procedural history of the <u>Ford</u> claim to a situation where an initial petition is dismissed for failure to exhaust state remedies and the petitioner returns to a federal habeas court after exhaustion. <u>See id.</u> at 644-45. The Court emphasized that "in both situations, the habeas petitioner does not receive an adjudication of his claim." <u>Id.</u> at 645. The Court further stated that "[t]o hold otherwise would mean that a dismissal of a first habeas petition for technical procedural reasons would bar the prisoner from ever obtaining federal habeas review." <u>Id.</u> Review of the <u>Ford</u> claim would have been precluded because, as the Court noted, the claim stood no chance of meeting § 2244's threshold for bringing a "second or successive" petition. This was because the claim had been previously presented and, even if newly presented, could have fit into neither of § 2244(b)(2)'s exceptions to the bar on such petitions. The Court was thus concerned with preventing Martinez-Villareal from being executed before any federal habeas review of his timely brought claim that he was incompetent to be executed.

In <u>Slack</u>, the prisoner filed a federal habeas petition raising both exhausted and unexhausted claims. The district court dismissed the entire petition without prejudice under the exhaustion of remedies rule of <u>Rose v. Lundy</u>, 455 U.S. 509 (1982). After his state post-conviction proceedings, Slack filed a new federal habeas petition. The district court found that the new petition was "second or successive" despite the fact that Slack's previous petition had been dismissed without prejudice for procedural reasons.

27

The Supreme Court rejected this conclusion, holding that "[a] habeas petition filed in the district court after an initial habeas petition was unadjudicated on its merits and dismissed for failure to exhaust state remedies is not a second or successive petition." Slack, 120 S. Ct. at 1604-05. In doing so, the Court relied on its analysis in Martinez-Villareal: "`[None] of our cases . . . have ever suggested that a prisoner whose habeas petition was dismissed for failure to exhaust state remedies, and who then did exhaust those remedies and returned to federal court, was by such action filing a successive petition.'" Slack, 120 S. Ct. at 1605 (quoting Martinez-Villareal, 523 U.S. at 644) (alteration in original). The Court emphasized that no claim made in the petition that had been dismissed under Rose v. Lundy had been adjudicated by the district court.

We believe that neither Martinez-Villareal nor Slack controls the instant case. Both Martinez-Villareal and Slack are predicated on the idea that the claim asserted was genuinely part of the prisoner's initial petition and was therefore entitled to an adjudication.**6** In Martinez-Villareal, the Ford claim was not adjudicated along with the other claims in the initial petition because it was premature. In Slack, none of the claims initially presented was accepted for filing because they were part of a mixed petition subject to dismissal without prejudice under Rose v. Lundy. Here, however, no part of Evans' initial petition was dismissed for "technical procedural reasons." The petition was instead accepted for filing and adjudicated on the merits. Unlike the Ford claim in Martinez-Villareal, Evans' Brady claim was not part of this first petition. And unlike the prisoner in Slack, Evans received an adjudication on the merits of his initial petition. There is accordingly

_____

**6** Other circuits have similarly recognized the limited scope of Martinez-Villareal's holding. See, e.g., In re Moore, 196 F.3d 252, 254 (D.C. Cir. 1999) ("The Supreme Court has clearly held that when a motion is dismissed for `technical procedural reasons' and `the habeas petitioner does not receive an adjudication of his claim,' a subsequent petition is not `a second or successive motion' under the AEDPA." (quoting Martinez-Villareal, 523 U.S. at 645)); In re Page, 179 F.3d 1024, 1025 (7th Cir. 1999) (Martinez-Villareal stands for the proposition that where a petition is dismissed for technical procedural reasons, the "dismissal does not affect the petitioner's right to file a subsequent petition").

28

no reason not to count Evans' now-adjudicated first petition as his one and only "initial" petition when considering his present attempt to file a Brady claim. Evans' effort to obtain federal habeas review of his Brady claim at this stage of the litigation can thus only be deemed a "second or successive" application for relief. As we have already rejected Evans' application for authorization to file such a petition, the district court lacks jurisdiction over the Brady claim.

VI.

Finding no merit in Evans' claims, we affirm the district court's denial of Evans' initial habeas petition. We also affirm the district court's denial of a stay and hold that Evans' Brady claim is a second or successive petition within the meaning of § 2244. For the reasons stated herein, both of Evans' petitions must be dismissed.

AFFIRMED AND DISMISSED

29