Filed: October 24, 2001

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

Nos. 98-4049(L)
(CR-96-458-WMN)

United States of America,

                                    Plaintiff - Appellee,

        versus

Allen Jett, a/k/a Al, et al.,

                                    Defendants - Appellants.


O R D E R


The court grants Appellants' motion to allow filing of transcript of oral arguments, grants panel rehearing, denies rehearing en banc, and amends its opinion filed September 18, 2001, as follows:

On page 5, first paragraph, line 2 -- the name "Antoine Marshall" is cut from line 2 and inserted into line 5 after the name "Allen Jett" -- "Appellants Allen Jett, Antoine Marshall, and Rodney Montgomery ...."

On page 25, first full paragraph, line 1 -- the name "Marshall" is inserted after the name "Jett" -- "Jett, Marshall, and Montgomery ...."

On page 26, first paragraph, lines 2-4 -- the first and second sentences on the page are re-written as follows: "We also conclude that Montgomery's sentence of 292 months and Marshall's sentence of 264 months affected their substantial rights. Montgomery and Marshall were convicted only of the drug trafficking count, and accordingly were each subject to a statutory maximum penalty of 240 months." The rest of the paragraph remains the same.

Entered at the direction of Judge Wilkins, with the concurrence of Judge Widener and Judge Luttig.

For the Court

/s/ Patricia S. Connor
Clerk

**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                      No. 98-4049

ALLEN JETT, a/k/a Al,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.
                                                        No. 98-4213

DARNELL MICHAEL JONES, a/k/a
Mookie,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.
                                                        No. 98-4288

JERRY ANTONIO WILLIAMS, a/k/a
Black Jerry,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

No. 98-4307

WARREN DEVON HILL, a/k/a Red
Dog,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

No. 98-4319

ANTOINE DEPAUL MARSHALL, a/k/a
Chim Chim,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

No. 98-4331

ALAN VINCENT CHAPMAN, a/k/a
Walli,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

No. 98-4332

JOHN LEVI BENTON, a/k/a Levi,
Defendant-Appellant.

2

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

No. 98-4351

RODNEY MONTGOMERY, a/k/a Boonie,
a/k/a Black,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

No. 99-4019

VICTOR UNDERWOOD, a/k/a Little
Vic,
Defendant-Appellant.

Appeals from the United States District Court
for the District of Maryland, at Baltimore.
William M. Nickerson, District Judge.
(CR-96-458-WMN)

Argued: April 3, 2001

Decided: September 18, 2001

Before WIDENER, WILKINS, and LUTTIG, Circuit Judges.

_____

Affirmed in part, dismissed in part, and vacated and remanded in part
by unpublished opinion. Judge Wilkins wrote the opinion, in which
Judge Widener and Judge Luttig joined.

_____

3

**COUNSEL**

**ARGUED:** Arcangelo Michael Tuminelli, Baltimore, Maryland; William Scott Little, STARK & LITTLE, Baltimore, Maryland; Stephen Clayton Gordon, FEDERAL PUBLIC DEFENDER'S OFFICE, Raleigh, North Carolina; Fred Warren Bennett, BENNETT & NATHANS, Greenbelt, Maryland; Thomas Turner Ruffin, Jr., Washington, D.C., for Appellants. Jamie M. Bennett, Assistant United States Attorney, Baltimore, Maryland, for Appellee. **ON BRIEF:** Nancy M. Cohen, Towson, Maryland, for Appellant Jett; David P. Henninger, LAW OFFICES OF DAVID P. HENNINGER, Bel Air, Maryland, for Appellant Hill; George A. Dubois, FEDERAL PUBLIC DEFENDER'S OFFICE, Raleigh, North Carolina, for Appellant Montgomery; William B. Purpura, Baltimore, Maryland, for Appellant Chapman; David R. Solomon, Baltimore, Maryland, for Appellant Underwood. Lynne A. Battaglia, United States Attorney, Baltimore, Maryland, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

**OPINION**

WILKINS, Circuit Judge:

Following a lengthy trial, Appellants[1] were convicted of various crimes in connection with their participation in a massive narcotics operation in Baltimore, Maryland. Appellants now raise numerous challenges to their convictions and sentences. With the exception of Appellant Jerry Williams' ("J. Williams") claim of ineffective assistance of counsel, which we dismiss, we reject Appellants' challenges

---

[1] Appellants are Allen Jett, Darnell Michael Jones, Jerry Antonio Williams, Warren Devon Hill, Antoine Depaul Marshall, Alan Vincent Chapman, John Levi Benton, Rodney Montgomery, and Victor Underwood.

4

to their convictions. We further conclude that Appellants Darnell Jones ("D. Jones"), Warren Hill, and Victor Underwood have failed to demonstrate plain error with respect to their challenges under Apprendi v. New Jersey, 530 U.S. 466 (2000). However, because J. Williams and Appellants Allen Jett, Antoine Marshall, and Rodney Montgomery have demonstrated plain error under Apprendi, and because United States v. Cotton, 2001 WL 901259 (4th Cir. Aug. 10, 2001), compels us to notice the error, we vacate those Appellants' sentences and remand for resentencing.

I.

Beginning in the late 1980s, Anthony Jones ("A. Jones") operated an increasingly large and violent drug distribution ring ("the Jones organization") in east Baltimore, Maryland. During part of the period relevant to this appeal, Montgomery supplied the organization with heroin and cocaine. Marshall and others repackaged the cocaine for street-level sales. Marshall also transported cocaine from New York to Baltimore.

As a means of protecting the organization and fostering a reputation as one to be feared and respected, A. Jones engaged in or directed acts of violence against others. For example, in the fall of 1994, A. Jones and D. Jones shot Keith Westmoreland to death because Westmoreland was suspected of providing information to law enforcement authorities. On another occasion, Jett, who served as an enforcer for the Jones organization, murdered Walter Green ("W. Green") at A. Jones' direction because W. Green had made disparaging remarks about A. Jones.

In early 1995, DeShane Carter ("D. Carter"), a partner of A. Jones', became involved in an altercation with Anthony Green ("A. Green"), a close associate of rival drug dealer Elway Williams ("E. Williams"). As a result of animosity stemming from that altercation, A. Jones and D. Carter murdered A. Green on March 31, 1995, sparking an ongoing feud between the Jones organization and the Williams organization. E. Williams subsequently hired Mark Coles and Appellants Hill and Chapman, known collectively as the "Young Guns," as enforcers. In October 1995, the Young Guns murdered D. Carter.

5

In the ensuing months, A. Jones and members of his organization repeatedly attempted to locate and kill E. Williams. There were also other acts of violence between the two organizations. For example, on January 25, 1996, Jett and another member of the Jones organization engaged in a shootout with the Young Guns. Coles was wounded during the shootout, and a friend of his who had no involvement in the drug business, Glen Wilson, was killed. As a result of the ongoing violence, both organizations were forced to limit their drug dealing activities, causing lost profits for all concerned.

In early February 1996, Appellant John Benton, who is Chapman's uncle, decided to attempt to broker a truce in an effort to save his nephew's life. Benton contacted Daniel Ross, an acquaintance of Benton's and a close associate of A. Jones'. At a meeting arranged by Ross, the Young Guns agreed to murder E. Williams in exchange for A. Jones' promise to forgo his efforts to kill them. On February 26, the Young Guns persuaded E. Williams and his driver, Derrick Rivers, to give them a ride to Coles' house. E. Williams and Rivers were in the front of the vehicle, and Coles, Chapman, and Hill were in the rear. During the drive to Coles' house, Chapman asked Rivers to pull down a side street so that the group could purchase alcohol at a bar. When the automobile came to a stop, Chapman, Hill, and Coles began firing their weapons. Rivers was killed almost immediately. E. Williams was severely wounded but managed to escape.

After the shooting, Benton took the Young Guns to a safe house. At that time, the Young Guns and Benton believed that E. Williams had been killed, and A. Jones was so informed. Benton left the safe house briefly and returned with $15,000 he had obtained from Ross and A. Jones; he distributed $3,000 each to Chapman, Hill, and Coles (leaving $6,000 unaccounted for). When it was learned that E. Williams had not died in the shooting, the Young Guns and A. Jones engaged in further attempts to take E. Williams' life. These efforts were ultimately abandoned, apparently due to A. Jones' incarceration on firearms charges in 1996.

While incarcerated, A. Jones continued to mastermind efforts to eliminate those perceived as a threat to the Jones organization. In May 1996, Jett killed Octavian Henry, a member of the organization who was suspected of providing information to law enforcement authori-

6

ties. In February 1997, an attempt was made on the life of Angelo Carter ("A. Carter"), another member of the Jones organization who was suspected of being an informant. In a fairly elaborate set up, D. Jones and J. Williams, who was an enforcer for the Jones organization, invited A. Carter to D. Jones' house; after A. Carter arrived, D. Jones asked him and J. Williams to go to a nearby restaurant for some food. What D. Jones and J. Williams knew, but A. Carter did not, was that the restaurant was to be the scene of an ambush. As J. Williams and A. Carter waited for their takeout order, Underwood entered the store and spoke briefly to the pair. As Underwood was leaving, he shot A. Carter in the leg. At about this time, a bystander observed a vehicle pull up in front of the restaurant and saw its occupants fire several shots at A. Carter, who was fleeing the restaurant on foot. One of these shots, or possibly another from Underwood, hit A. Carter in the back as he was running. A. Carter survived the attack.

Based upon this evidence, Appellants were convicted of the following crimes:

> - Conspiracy to commit murder in aid of racketeering (E. Williams), see 18 U.S.C.A. § 1959(a)(5) (West 2000): Benton, Chapman, Hill, Jett, and J. Williams;
>
> - Murder in aid of racketeering (Rivers), see 18 U.S.C.A. § 1959(a)(1) (West 2000): Chapman and Hill;
>
> - Attempted murder in aid of racketeering (E. Williams), see 18 U.S.C.A. § 1959(a)(5): Chapman and Hill;
>
> - Murder in aid of racketeering (Westmoreland), see 18 U.S.C.A. § 1959(a)(1): D. Jones;
>
> - Conspiracy to retaliate against witnesses (Henry and A. Carter), see 18 U.S.C.A. § 371 (West 2000): D. Jones, Jett, Underwood, and J. Williams;
>
> - Conspiracy to distribute heroin and cocaine, see 21 U.S.C.A. § 846 (West 1999): All Appellants except Benton.

Appellants now raise numerous challenges to their convictions and sentences.

II.

All Appellants challenge rulings of the district court denying their motion to sever and rejecting their claim that the Government exercised its peremptory strikes in a racially discriminatory manner. We conclude that both challenges lack merit.

A.

Prior to trial, the district court denied Appellants' motion for severance under Federal Rule of Criminal Procedure 14. Appellants challenge this ruling on appeal, maintaining that they were prejudiced by the joint trial. We reject this contention.

Federal Rule of Criminal Procedure 8(b) provides that "[t]wo or more defendants may be charged in the same indictment . . . if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." Ordinarily, defendants who are indicted together should be tried together; joint trials "promote efficiency and serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts." Zafiro v. United States, 506 U.S. 534, 537 (1993) (internal quotation marks omitted).

A district court may sever defendants if a joint trial will prejudice the defendant or the Government. See Fed. R. Crim. P. 14. The proponent of severance bears the burden of demonstrating that a joint trial will cause actual prejudice. See United States v. Reavis, 48 F.3d 763, 767 (4th Cir. 1995). Because "a certain amount of conflict among defendants is inherent in most multi-defendant trials," United States v. Smith, 44 F.3d 1259, 1267 (4th Cir. 1995), a defendant desiring severance "must show more than merely that a separate trial would offer . . . a better chance of acquittal," United States v. Spitler, 800 F.2d 1267, 1271 (4th Cir. 1986) (internal quotation marks omitted). Rather, severance is appropriate "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defen-

8

dants, or prevent the jury from making a reliable judgment about guilt or innocence." Zafiro, 506 U.S. at 539. A district court possesses broad discretion in ruling on a motion for severance. See Smith, 44 F.3d at 1266.

We conclude that the district court did not abuse its discretion in denying the severance motion. In the first place, we note that only Jett makes any specific argument regarding prejudice. He maintains that the evidence against him was weak and that the jury "would likely have reached a different result" had it not been presented with evidence admissible only against Jett's codefendants. Br. of Appellants at 36. The remaining Appellants argue generally that they presented inconsistent defenses and that the mass of evidence made it impossible for the jury to separately assess the culpability of each defendant. None of these arguments persuades us that the district court abused its discretion. We have consistently refused to reverse the denial of a motion for severance when the verdict returned by the jury "demonstrate[s] its ability to follow the instructions and match evidence with defendants and counts." United States v. Riley, 991 F.2d 120, 125 (4th Cir. 1993); see, e.g., United States v. Ford, 88 F.3d 1350, 1361 (4th Cir. 1996). Here, the jury demonstrated its ability to "match evidence with defendants and counts" when it acquitted Benton of the drug conspiracy charge. We therefore affirm the denial of the motion for severance.

B.

During the course of jury selection, the Government used eight of its 12 peremptory challenges to strike black female venire members. Appellants objected to the Government's use of its peremptory challenges under Batson v. Kentucky, 476 U.S. 79 (1986), and its progeny, arguing that the Government had discriminated on the basis of race in exercising its challenges, thereby violating the Equal Protection Clause. We conclude that the district court did not err in rejecting Appellants' Batson claim.

The exercise of peremptory challenges by the Government in a racially discriminatory manner violates the Equal Protection Clause. See Batson, 476 U.S. at 89. A defendant who challenges the exercise of a peremptory challenge on equal protection grounds bears the bur-

9

den of proving intentional discrimination by the Government. See id. at 93 ("As in any equal protection case, the burden is, of course, on the [party] who alleges discriminatory selection . . . to prove the existence of purposeful discrimination." (internal quotation marks omitted)). The Supreme Court has delineated a burden-shifting procedure for courts to follow in analyzing a claim of purposeful discrimination in the jury selection process. See Evans v. Smith, 220 F.3d 306, 312 (4th Cir. 2000), cert. denied, 121 S. Ct. 1367 (2001). The party raising the equal protection challenge must first establish a prima facie case of purposeful discrimination in the selection process, in light of all of the "relevant circumstances, including whether there has been a pattern of strikes against members of a particular race." Edmonson v. Leesville Concrete Co., 500 U.S. 614, 631 (1991). Once a prima facie case of discrimination is established, the burden shifts to the party whose conduct is challenged to come forward with a nondiscriminatory explanation for the use of the peremptory strike. See Purkett v. Elem, 514 U.S. 765, 767 (1995) (per curiam). To satisfy this burden, the party need offer only a race-neutral explanation for the strike; the reason need not be worthy of belief or related to the issues to be tried or to the prospective juror's ability to provide acceptable jury service. See id. at 767-68. The trial court must then decide whether the party challenging the selection process has proven that the decision to exercise the strike was motivated by racial bias. See id. at 767. "A finding by the district court concerning whether a peremptory challenge was exercised for a racially discriminatory reason is given great deference by this court; we review that finding only for clear error." Jones v. Plaster, 57 F.3d 417, 421 (4th Cir. 1995); see Hernandez v. New York, 500 U.S. 352, 365 (1991) (plurality opinion) (explaining that "the best evidence [regarding discriminatory purpose] often will be the demeanor of the attorney who exercises the challenge," evaluation of which "lies peculiarly within a trial judge's province" (internal quotation marks omitted)).

Here, the district court initially ruled that Appellants had made out a prima facie case of a Batson violation. Although the court later reversed itself on that point, it did so only after the Government had proffered its explanations for the challenged strikes. And, the court ruled that even if it assumed that Appellants had made out a prima facie case, the Government had proffered race-neutral explanations for the challenged peremptory strikes and Appellants had not demon-

10

strated that those explanations were pretextual. Accordingly, we consider only the question of whether the district court committed clear error in accepting the Government's explanations. See Hernandez, 500 U.S. at 359 (plurality opinion).

1. Venire Member #10186

The Government explained that it struck venire member #10186 because she had previously served on a jury that deadlocked and because she lived in zip code 21206, close to the area in which the criminal activity occurred. Both of these proffered explanations are racially neutral. See Malone v. Vasquez, 138 F.3d 711, 720 & n.13 (8th Cir. 1998) (holding that prosecutor's "experience [that] it was not a good idea to have jurors who were familiar with the area of a crime" was race-neutral reason for peremptory strike); United States v. Rudas, 905 F.2d 38, 41 (2d Cir. 1990) (holding that venire member's prior service on hung jury was legitimate reason for peremptory strike).

Appellants argue that the Government's "zip code" explanation is implausible because the Government did not strike another venire member who lived in zip code 21206 and did not strike venire members who lived in zip code 21205, which is contiguous with the zip code in which the criminal activity took place. See Purkett, 514 U.S. at 768 (noting that an implausible explanation for a peremptory strike may be evidence of purposeful discrimination). Even if we discredit the Government's "zip code" explanation, however, a legitimate basis for striking venire member #10186--her prior service on a deadlocked jury--remains, and is unchallenged by Appellants.

2. Venire Members #10180 and #10158

The Government contended that it struck venire members #10180 and #10158 because it was concerned that they lacked the intellectual capacity to serve as jurors. See United States v. Montgomery, 210 F.3d 446, 453-54 (5th Cir. 2000) (affirming rejection of Batson challenge to strike assertedly based upon intellectual capacity of venire member). Specifically, the Government noted that venire member #10180 appeared to have been unable to complete the juror questionnaire; she responded "yes" to a question asking whether she lived in

11

an apartment or a single-family home, and responded "I don't know what you mean" to a question asking her to describe her neighborhood, misspelling the word "know." J.A. 262. Venire member #10180 also had difficulty answering the questions of the district court during voir dire. The Government observed that venire member #10158's questionnaire contained numerous misspellings and that she seemed to have trouble understanding and responding to questions during voir dire.

Appellants note that both venire members had completed high school and had been employed for many years. At best, these facts tend to undermine the Government's explanation for the strikes. Ultimately, however, the district court was required to make a credibility determination based on numerous factors including the demeanor of counsel for the Government, and we cannot say that the district court clearly erred in crediting the Government's explanation. See Anderson v. City of Bessemer City, 470 U.S. 564, 575 (1985).

3. Venire Member #10109

The Government asserted that it struck venire member #10109 primarily because she had a friend who had witnessed a shooting and was in witness protection; the Government was concerned that the experience of the venire member's friend "might have an intimidating effect on [the venire member's] ability to support the government." J.A. 264. The Government also cited the venire member's youthful age (22) and concomitant lack of substantial community ties and the fact that she lived in zip code 21207, near where the criminal activity took place.

Appellants challenge the Government's explanations on two fronts. First, they maintain that venire member #10109's employment as a schoolteacher constituted a sufficient tie to the community. Even if the facts regarding the venire member's employment would allow a finding of racial bias, they do not demand such a finding. The contrary conclusion reached by the district court therefore was not clearly erroneous. See United States v. Spriggs, 102 F.3d 1245, 1255 (D.C. Cir. 1996) (per curiam) (holding that district court did not commit clear error in crediting Government's explanation that it struck a potential juror because it "was looking for . . . people who had raised

12

families in this city, people who have a stake in our community" (internal quotation marks omitted)). Second, Appellants point out that zip code 21207 is not near the area where the criminal activity took place and that several other venire members lived in that zip code but were not struck by the Government. Even if we accept Appellants' argument on this point, Appellants do not challenge the primary basis for the strike--that the venire member's association with someone in witness protection might make her hesitant to vote to convict in a case involving allegations of retaliation against Government witnesses.

### 4. Venire Members #10101 and #10099

The Government explained that it struck these venire members because of concern that they might be biased against law enforcement officers. Venire Member #10101 had been married to a Baltimore City police officer with 30 years of service in the Eastern District of Baltimore, the district where the criminal activity took place. The Government asserted that certain responses given by this venire member during voir dire caused the Government to question whether she could be impartial, particularly given that the evidence at trial would include allegations of police corruption. As to venire member #10099, the Government explained that it believed she might be biased against the police based on her statement during voir dire that, when her sister had been robbed, the police did not respond as quickly as they should have because of the neighborhood in which the crime took place. Both of these explanations are race neutral. See United States v. Gonzalez-Balderas, 11 F.3d 1218, 1222-23 (5th Cir. 1994) (accepting, as nondiscriminatory, strike based on Government's concern that venire member would be biased because of relation to police officers who served in area that was subject of trial and as to which there would be allegations of police corruption); United States v. Campbell, 980 F.2d 245, 249 (4th Cir. 1992) (holding that potential dissatisfaction with police response to crime was proper basis for peremptory challenge).

Appellants do not appear to dispute the neutrality of the Government's explanations for the strikes; rather, they maintain that the evidence does not support the Government's claim of potential bias. With respect to venire member #10101, Appellants note that she was divorced and estranged from her former husband. Yet again, this

13

assertion amounts to nothing more than a conflict in the evidence, and we cannot say that the district court committed clear error in crediting the Government's explanation. We also reject Appellants' contention that the strike of venire member #10099 was improper because she advised the district court that she could be fair and impartial regardless of any opinion she might have of the police handling of the robbery of her sister. The Government's explanation of a peremptory strike need not rise to the level of a challenge for cause. See Evans, 220 F.3d at 312.

In sum, we conclude that the district court did not commit clear error in accepting, as nondiscriminatory, the Government's explanations for the challenged strikes. We therefore reject Appellants' Batson challenge.

III.

We next consider J. Williams' claims concerning the actions of his trial counsel. On the morning the Government completed its case in chief, J. Williams wrote notes to two prospective defense witnesses, Hilton Thomas and Sean Dill. Both were expected to testify regarding the murder of John Jones. In the letters, J. Williams recounted the testimony of prosecution witnesses, in violation of the witness sequestration order entered by the district court, and advised Thomas and Dill how to testify. J. Williams gave the letters to his attorney and instructed him to deliver the letters to Thomas and Dill. Counsel reviewed the letters and advised J. Williams against giving them to the witnesses, but J. Williams persisted and counsel offered no further protest. During the luncheon recess, counsel met with Thomas and Dill, who were incarcerated, and attempted to show them the letters through the plexiglass partition in the visiting room. When Thomas and Dill were unable to read the letters through the partition, counsel gave the letters to a United States Marshal and asked him to deliver them. The Marshal read the letters, copied them, and delivered the originals to Thomas and Dill. The copies were provided to counsel for the Government, who subsequently moved to exclude the testimony of Thomas and Dill. The district court granted this motion, and additionally ruled that the letters could be introduced in the Government's rebuttal case if J. Williams took the stand in his own defense. J. Williams elected not to testify.

14

J. Williams now contends that his trial counsel was constitutionally ineffective. To prevail on this claim, J. Williams must demonstrate that "counsel's representation fell below an objective standard of reasonableness" and "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 688, 694 (1984). A "reasonable probability" is one sufficient to undermine our confidence in the outcome. See id. at 694.

J. Williams' ineffective assistance claim faces an additional hurdle. A defendant may obtain review of an ineffective assistance claim on direct appeal by first presenting the claim to the district court in a motion for new trial pursuant to Federal Rule of Criminal Procedure 33. See United States v. Russell, 221 F.3d 615, 619 (4th Cir. 2000). Because J. Williams did not follow this course, we will review his claim only if the constitutional violation "conclusively appears" on the face of the record. Id. at 619 n.5 (internal quotation marks omitted). Our reluctance to review ineffective assistance claims on direct appeal stems from the fact that "the record is usually inadequately developed," revealing "only ambiguous symptoms of a more complex set of relationships which cannot be adequately addressed on direct appeal." United States v. Tatum, 943 F.2d 370, 379 (4th Cir. 1991). For this reason, ineffective assistance claims usually are better raised in a motion to vacate sentence pursuant to 28 U.S.C.A. § 2255 (West Supp. 2001). See id.

Here, we have little difficulty concluding, from the face of the record, that the performance of J. Williams' counsel fell below an objective standard of reasonableness. Upon reading the letters, counsel should have been aware that delivering them would at least violate the witness sequestration order and could also constitute subornation of perjury. However, we cannot discern from the face of the record whether J. Williams was prejudiced by his counsel's deficiencies. We accordingly dismiss this claim.[2]

---

[2] J. Williams also maintains that his attorney's actions constituted criminal and ethical violations and thus created an actual conflict of interest that adversely affected counsel's performance, requiring reversal without a specific showing of prejudice. See Cuyler v. Sullivan, 446 U.S. 335,

15

IV.

Jett raises two challenges to his conviction. First, he contends that the district court erred in allowing the Government to impeach him with prior written and oral statements when the Government had failed to disclose those statements prior to trial. Second, Jett maintains that the conditions of his confinement constituted a denial of access to counsel in violation of the Sixth Amendment. We reject both of these claims.

A.

Jett testified in his own defense at trial and denied involvement in the murders of W. Green, Octavian Henry, and Glen Wilson. Jett further denied any relationship with A. Jones. On cross-examination, the Government sought to impeach Jett with a letter he had written to a federal prosecutor offering to provide information about the Jones organization and with oral statements made during a proffer session. Jett objected, maintaining that the Government had violated Federal Rule of Criminal Procedure 16(a)(1)(A) by failing to disclose the written and oral statements to defense counsel prior to trial. The district court overruled this objection.

As is relevant here, Rule 16(a)(1)(A) requires the Government to disclose to the defendant "any relevant written .. . statements made by the defendant" within the possession of the Government and known to the prosecutor, and the substance of any oral statement given in response to interrogation by a Government agent "if the [G]overnment intends to use that statement at trial." The Government concedes that its failure to disclose the written and oral statements violated Rule 16(a)(1)(A). See United States v. Scafe, 822 F.2d 928, 935 (10th Cir. 1987) (holding that the discovery obligations of Rule

_____

348-50 (1980). We reject this claim on its merits. The record is clear that at the time of trial, J. Williams' counsel was absolutely unaware that his actions were legally or ethically suspect. Even assuming that an actual conflict can exist absent counsel's awareness of any problem, we fail to see--and J. Williams has not demonstrated--how a conflict of which counsel was unaware could have adversely affected his performance.

16

16(a)(1)(A) apply to evidence used in rebuttal or on cross-examination).

We conclude, however, that Jett was not substantially prejudiced by the nondisclosure, and therefore that reversal is not required. See United States v. Camargo-Vergara, 57 F.3d 993, 998 (11th Cir. 1995). "Substantial prejudice exists when a defendant is unduly surprised and lacks an adequate opportunity to prepare a defense, or if the mistake substantially influences the jury." Id. at 998-99; see United States v. Salameh, 152 F.3d 88, 130 (2d Cir. 1998) (per curiam) ("Substantial prejudice means the prejudice resulting from the [G]overnment's untimely disclosure of evidence, rather than the prejudice attributable to the evidence itself." (internal quotation marks omitted)). We first note that Jett could not have been "unduly surprised" by the statements, since he himself made them. See United States v. Rivera, 944 F.2d 1563, 1566 (11th Cir. 1991). Additionally, Jett's failure to request a continuance when the Government sought to introduce the written and oral statements on cross-examination tends to indicate that no prejudice existed. See United States v. Beras, 183 F.3d 22, 27 (1st Cir. 1999). Finally, there is no possibility that the discovery violation had a substantial influence on the determination of guilt by the jury. The evidence supporting the charges against Jett was substantial, and the improper admission of Jett's prior statements added little to the Government's case. See United States v. Bueno-Sierra, 99 F.3d 375, 380 (11th Cir. 1996) (per curiam); United States v. Stevens, 985 F.2d 1175, 1181 (2d Cir. 1993).

B.

Prior to trial, Jett was transferred from the Baltimore City Detention Center to the Maryland Correctional Adjustment Center (MCAC). At MCAC, Jett was not allowed contact visits with counsel. And, because of a malfunctioning telephone system in the visiting area, counsel sometimes was forced to shout through a plexiglass partition in order to communicate with Jett. Additionally, counsel's repeated requests that Jett be allowed to listen to and discuss with counsel a tape that would be introduced at trial were denied. Jett maintains that these difficulties were so severe as to constitute a violation of his Sixth Amendment right to counsel.

17

The constitutional guarantee of counsel necessarily includes the "opportunity for . . . counsel to confer, to consult with the accused and to prepare his defense." Avery v. Alabama, 308 U.S. 444, 446 (1940). Complete denial of the assistance of counsel, whether actual or constructive, is per se reversible error. See Perry v. Leeke, 488 U.S. 272, 280 (1989). Not every restriction on counsel's access to the defendant amounts to a deprivation of the right to counsel, however. See id. at 280-85 (holding that prohibition of consultation between defendant and defense counsel during brief recess between defendant's testimony on direct and cross-examination did not amount to complete denial of counsel).

Here, although counsel's representation of Jett was unquestionably rendered more difficult by the conditions at MCAC, those difficulties were not so severe as to amount to the total denial of access to counsel. The record demonstrates that Jett's counsel vigorously defended him throughout the trial. And, Jett points to no specific prejudice arising from the problems he had communicating with counsel.

V.

Benton, Chapman, and Hill maintain that the district court erred in denying their motions for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 with respect to the racketeering charges arising from the murder of Rivers and the attempted murder of E. Williams.**3** We review the denial of a motion for a judgment of acquittal de novo. See United States v. Romer, 148 F.3d 359, 364 (4th Cir. 1998). When, as here, the motion for judgment of acquittal is based on the sufficiency of the evidence, our role is limited to considering whether "there is substantial evidence, taking the view most favorable to the Government, to support" the verdict. Glasser v. United States, 315 U.S. 60, 80 (1942). We must bear in mind that "[t]he jury, not the reviewing court, weighs the credibility of the evidence and resolves any conflicts in the evidence presented." United States v. Murphy, 35 F.3d 143, 148 (4th Cir. 1994). Further, "if the

---

**3** As noted previously, Benton, Chapman, and Hill were convicted of conspiracy to murder E. Williams in aid of racketeering. Chapman and Hill were also convicted of murdering Rivers in aid of racketeering and attempting to murder E. Williams in aid of racketeering.

18

evidence supports different, reasonable interpretations, the jury decides which interpretation to believe." Id. Reversal for insufficient evidence is reserved for cases in which "the prosecution's failure is clear." Burks v. United States, 437 U.S. 1, 17 (1978). In sum, we "may not overturn a substantially supported verdict merely because [we] find[ ] the verdict unpalatable or determine[ ] that another, reasonable verdict would be preferable." United States v. Burgos, 94 F.3d 849, 862 (4th Cir. 1996) (en banc); see United States v. Hoyte, 51 F.3d 1239, 1245 (4th Cir. 1995) (observing that a defendant challenging the sufficiency of the evidence to support his conviction bears "a heavy burden").

As is relevant here, 18 U.S.C.A. § 1959(a) provides for the punishment of

> [w]hoever, as consideration for the receipt of. . . anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders . . . or attempts or conspires to do so . . ..

Thus, the Government was required to prove (1) that the Jones organization was an enterprise engaged in racketeering activity; (2) that Benton, Chapman, and Hill conspired to murder E. Williams and that Chapman and Hill murdered Rivers and attempted to murder E. Williams; and (3) that Benton, Chapman, and Hill committed these acts either (a) as consideration for the receipt of something of pecuniary value or (b) for the purpose of gaining entrance to the Jones organization. Cf. United States v. Concepcion, 983 F.2d 369, 381 (2d Cir. 1992) (setting forth similar description of the elements of 18 U.S.C.A. § 1959(a)). Benton, Chapman, and Hill do not dispute that the Government presented sufficient evidence regarding the first and second elements. Rather, they maintain that the Government failed to prove that their actions against Rivers and E. Williams were taken in exchange for pecuniary gain or for the purpose of gaining entrance to the Jones organization.

We begin with Benton's sufficiency challenge. We agree with Benton that the Government presented no evidence to support a conclu-

19

sion that his participation in the conspiracy to murder E. Williams was undertaken for the purpose of gaining entry into the Jones organization.[4] Accordingly, the denial of Benton's motion for acquittal can be affirmed only if there is sufficient evidence to support a conclusion that Benton conspired to murder E. Williams in exchange for something of pecuniary value from the Jones organization. The evidence presented by the Government was certainly adequate for this purpose. As described above, the Government presented testimony that after the shooting of Rivers and E. Williams, Benton took the Young Guns to a safe house, left briefly, and returned with $15,000 obtained from A. Jones and Ross. Benton distributed $3,000 of this money to each of the Young Guns, leaving $6,000 unaccounted for.

Benton argues that this evidence allowed the jury to convict him only "by piling inference upon inference," Direct Sales Co. v. United States, 319 U.S. 703, 711 (1943), but we do not agree. At a minimum, a reasonable jury could infer from the speed with which Benton obtained the money that the parties shared an expectation that completion of the assigned task of murdering E. Williams would be followed by monetary remuneration. And, in light of the evidence that Benton received $15,000 but dispensed only $9,000 to the Young Guns, it requires no great leap to conclude that Benton kept the remaining $6,000. We therefore affirm the denial of Benton's motion for judgment of acquittal.

We also conclude that substantial evidence supports the convictions of Chapman and Hill. As with Benton, the facts relating to the payment made following the attempt on E. Williams' life support a conclusion that Chapman and Hill acted not simply to preserve their own lives, but also for pecuniary gain. See Concepcion, 983 F.2d at 381 (holding that purposes specified in 18 U.S.C.A. § 1959 need not be defendant's "sole or principal motive" for committing charged act of violence). And, the evidence presented at trial also supports a finding that Chapman and Hill engaged in acts of violence against Rivers and E. Williams for the purpose of gaining entry into the Jones organization. A rational jury could conclude that in betraying their former employer, Chapman and Hill aligned themselves with the Jones orga-

---

[4] Indeed, the jury acquitted Benton of participating in the narcotics dealing activity that was the primary focus of the Jones organization.

20

nization and that A. Jones, in agreeing to lift the contract on the lives of the Young Guns, accepted this alliance and allowed them into the Jones organization.**5**

VI.

Underwood, whose participation in the attempt on A. Carter's life led to his conviction for conspiring to retaliate against Government witnesses, maintains that he was entitled to an alibi instruction. We review the refusal of the district court to give this instruction for abuse of discretion, see United States v. Abbas, 74 F.3d 506, 513 (4th Cir. 1996), bearing in mind that Underwood was entitled to the instruction if it was supported by the evidence presented at trial, see United States v. Hicks, 748 F.2d 854, 857 (4th Cir. 1984).

An alibi is "[a] defense that places the defendant at the relevant time of crime in a different place than the scene involved and so removed therefrom as to render it impossible for him to be the guilty party." Black's Law Dictionary 71 (6th ed. 1990). Underwood's "alibi" defense consisted of testimony from himself and others that he was present at the restaurant at the same time as A. Carter but that he did not shoot A. Carter and left the scene before the shooting occurred. As the Government points out, this is not an alibi; it is simply an assertion of innocence. Accordingly, the district court did not abuse its discretion in denying the requested instruction.

VII.

We turn now to Marshall's challenge to his conviction. Marshall was charged only with the narcotics conspiracy. In addition to evidence regarding Marshall's role in narcotics dealing, the Government presented evidence that Marshall assisted in disposing of the body of Charles Addison, Jr., who was accidentally shot to death while mem-

---

**5** Chapman and Hill also contend that the evidence was insufficient to support their convictions for conspiring to distribute cocaine and heroin. Based on the evidence presented at trial, a rational jury could conclude that Chapman and Hill became members of the narcotics conspiracy that was the focus of the Jones organization by agreeing to murder E. Williams.

21

bers of the conspiracy were packaging cocaine for sale. Marshall asserts that the presentation of this evidence amounted to a constructive amendment of the indictment.

A constructive amendment occurs "[w]hen the[G]overnment, through its presentation of evidence and/or its argument, or the district court, through its instructions to the jury, or both, broadens the bases for conviction beyond those charged in the indictment." United States v. Randall, 171 F.3d 195, 203 (4th Cir. 1999). A constructive amendment is a structural error not subject to review for harmlessness. See United States v. Floresca, 38 F.3d 706, 712 (4th Cir. 1994) (en banc).

We conclude that the presentation of the challenged evidence did not constructively amend the indictment by allowing the jury to convict Marshall of a crime not charged by the grand jury. The evidence regarding Marshall's involvement in the disposal of Addison's body was plainly relevant to his participation in the narcotics conspiracy, in that the testimony established that the decision to leave the body in an alley was made in order to prevent the police from discovering the cocaine packaging operation in progress at the time of the shooting. Accordingly, the evidence was intrinsically related to the charged conspiracy and its presentation did not amend the indictment.**6** See United States v. Hughes, 213 F.3d 323, 329 (7th Cir.) (holding that introduction of evidence of uncharged criminal activity did not constructively amend indictment because evidence "completed the story of the crime or crimes charged and was necessary to enable the jury to fully understand and make sense of" charged conspiracy (internal quotation marks omitted), vacated, 121 S. Ct. 423 (2000), judgment reinstated in pertinent part, 248 F.3d 1160 (7th Cir. 2001) (unpublished order).

---

**6** For this reason, Marshall's alternative argument--that the admission of the evidence violated Federal Rule of Evidence 404(b)--also fails. See United States v. Chin, 83 F.3d 83, 88 (4th Cir. 1996) (holding that evidence of other crimes, wrongs, or acts is admissible when it is "inextricably intertwined" with the charged offense (internal quotation marks omitted)).

22

VIII.

All Appellants except Benton were convicted of conspiring to distribute cocaine and heroin and were sentenced to varying terms of imprisonment--ranging from 262 months to life--for those convictions. However, none of these sentences was based on findings regarding the type and quantity of narcotics attributable to each Appellant. Rather, in each case the district court applied a cross-reference to the murder guideline based on the various homicides with which, the district court found at sentencing, each Appellant had been involved during the course of the narcotics conspiracy.[7] See United States Sentencing Guidelines Manual § 2D1.1(d)(1) (1997).[8] The drug trafficking count of the indictment did not allege a specific quantity of narcotics, and the jury was not instructed to make a finding regarding the quantity of drugs involved in the conspiracy.

Appellants now challenge their sentences, maintaining that their

---

[7] While the district court was correct that application of the cross-reference made findings regarding drug type and quantity unnecessary for purposes of applying the sentencing guidelines, the court erred in failing to make such findings for purposes of determining the maximum statutory penalty faced by each Appellant. See United States v. Bowens, 224 F.3d 302, 314 (4th Cir. 2000) (indicating that 21 U.S.C.A. § 841 sets forth different maximum penalties depending upon the quantity and type of narcotics involved in the offense, as to which the district court must make findings at sentencing), cert. denied, 121 S. Ct. 1408 (2001). In short, the district court improperly assumed that each Appellant was subject to a statutory maximum penalty of life imprisonment. Without a finding regarding the applicable statutory maximum, the district court simply could not know whether the guideline sentence it imposed was within statutory limits. See Edwards v. United States, 523 U.S. 511, 515 (1998) ("[A] maximum sentence set by statute trumps a higher sentence set forth in the Guidelines."). However, in light of our conclusion that, under Apprendi, the statutory maximum penalty for all Appellants was 20 years, we need not remand for correction of this error.

[8] The murder guideline, U.S.S.G. § 2A1.1, sets a base offense level of 43, resulting in a presumptive life sentence in all cases. See U.S.S.G. Ch.5, Pt.A (sentencing table). The variations among Appellants' sentences resulted from downward departures by the district court as to some Appellants.

23

convictions for conspiring to distribute an unspecified quantity of heroin and cocaine subjected them to a maximum penalty of 20 years pursuant to 21 U.S.C.A. § 841(b)(1)(C) (West Supp. 2001). Because Appellants failed to raise this claim before the district court, our review is for plain error.**9** See Fed. R. Crim. P. 52(b); United States v. Olano, 507 U.S. 725, 731-32 (1993). In order to demonstrate plain error, Appellants must show that an error occurred, that the error was plain, and that the error affected their substantial rights. See Olano, 507 U.S. at 732; United States v. Jackson, 124 F.3d 607, 614 (4th Cir. 1997). Even if Appellants can satisfy these requirements, correction of the error remains within our discretion, which we "should not exercise . . . unless the error `seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" Olano, 507 U.S. at 732 (second alteration in original) (quoting United States v. Young, 470 U.S. 1, 17 (1985)).

We conclude that all Appellants have demonstrated error. Although Appellants' convictions on the drug conspiracy charge subjected them to a maximum statutory penalty of 20 years (240 months), each Appellant received a sentence greater than 20 years. As explained in United States v. Promise, 255 F.3d 150, 156-57 (4th Cir. 2001) (en banc), this was error. Moreover, the error was plain. See id. at 160. Accordingly, we turn to the question of whether the error affected Appellants' substantial rights.

An error affects substantial rights when it is prejudicial, i.e. when it "actually affect[s] the outcome of the proceedings." United States v. Hastings, 134 F.3d 235, 240 (4th Cir. 1998). Chapman, Hill, and D. Jones, each of whom received a life sentence on the drug trafficking conviction, cannot demonstrate that their substantial rights were

---

**9** Appellants maintain that Antoine Marshall objected to the failure to allege specific drug quantity in the indictment in a pretrial motion and maintain that they joined in this objection prior to trial. We disagree. The portion of Marshall's motion to which Appellants refer argues only that the Government improperly charged Marshall with distributing a "mixture or substance" containing cocaine or heroin; at no point does the motion claim that drug quantity is an element of the offense. Indeed, several times the motion argues that drug quantity is an issue for sentencing, not for trial.

24

affected because they also received life sentences for murder in aid of racketeering. Underwood, who received a sentence of 262 months on the drug trafficking conviction, cannot demonstrate that the error affected his substantial rights because he was convicted of two offenses carrying a total maximum statutory penalty of 300 months.**10** Had the district court been aware when it sentenced Underwood that the maximum penalty for his drug trafficking conviction was 20 years, U.S.S.G. § 5G1.2(d) would have obligated the court to achieve the guideline sentence of 262 months "by imposing a term of imprisonment of 240 months or less on each count of conviction and ordering those terms to be served consecutively to achieve the total punishment mandated by the guidelines." United States v. Angle, 254 F.3d 514, 518 (4th Cir. 2001) (en banc).

In contrast, J. Williams, Jett, Marshall, and Montgomery have demonstrated that the error affected their substantial rights. J. Williams and Jett, both of whom received life sentences on the drug trafficking convictions, were each convicted of three counts carrying an aggregate statutory maximum penalty of 35 years.**11** Had the district court been aware at the time of sentencing that the maximum statutory penalty for the drug trafficking convictions was 20 years, it would have been required to impose consecutive sentences for each count of conviction in order to approximate, as closely as possible, the guidelines sentence of life imprisonment. See U.S.S.G. § 5G1.2(d); see also United States v. Saccoccia, 58 F.3d 754, 786 & n.28 (1st Cir. 1995) (approving a 660-year sentence imposed pursuant to § 5G1.2(d) as "the functional equivalent of life without parole"). But, because we cannot say that 35 years imprisonment is the functional equivalent of a life sentence, we conclude that J. Williams' and Jett's substantial rights were

---

**10** In addition to the 240-month statutory maximum penalty for the drug trafficking conviction, Underwood was subject to a statutory maximum penalty of five years for conspiring to retaliate against Government witnesses in violation of 18 U.S.C.A. § 1513(a)(1). See 18 U.S.C.A. § 371.

**11** In addition to the 20-year statutory maximum penalty for the drug trafficking conviction, Williams and Jett faced a ten-year statutory maximum penalty for conspiring to commit murder in aid of racketeering, see 18 U.S.C.A. § 1959(a)(5), and a five-year statutory penalty for conspiring to retaliate against Government witnesses in violation of 18 U.S.C.A. § 1513(a)(1), see 18 U.S.C.A. § 371.

25

affected by the imposition of life sentences on the drug trafficking convictions. We also conclude that Montgomery's sentence of 292 months and Marshall's sentence of 264 months affected their substantial rights. Montgomery and Marshall were convicted only of the drug trafficking count, and accordingly were each subject to a statutory maximum penalty of 240 months. As we held in Promise, an error such as this affects substantial rights. See Promise, 255 F.3d at 160-61.

In Promise, those members of the en banc court that considered the question were equally divided regarding whether to notice an Apprendi error like the errors here. Compare id. at 161-64 (Wilkins, J., joined by Wilkinson, C.J, and Williams and Traxler, JJ.) (arguing that error should not be noticed) with id. at 186-91 (Motz, J., joined by Widener, Michael, and King, J.J.) (arguing that error should be noticed). Thus, the question was left open for a subsequent panel. Recently, a panel of this court held that the imposition of a sentence greater than that allowed by a defendant's conviction must be noticed on plain error review. See United States v. Cotton, 2001 WL 901269, at *5-*7 (4th Cir. Aug. 10, 2001). We are compelled to follow Cotton and accordingly must notice the plain errors in the sentences of J. Williams, Jett, and Montgomery. See Etheridge v. Norfolk & W. Ry. Co., 9 F.3d 1087, 1090 (4th Cir. 1993) ("A decision of a panel of this court becomes the law of the circuit and is binding on other panels unless it is overruled by a subsequent en banc opinion of this court or a superseding contrary decision of the Supreme Court." (internal quotation marks omitted)).

IX.

For the reasons set forth above, we reject all of Appellants' challenges to their convictions except for J. Williams' claim of ineffective assistance of counsel, which we dismiss. We therefore affirm Appellants' convictions. However, we vacate the sentences of J. Williams, Jett, Marshall, and Montgomery and remand for resentencing.

AFFIRMED IN PART, DISMISSED IN PART, AND VACATED AND REMANDED IN PART

26